# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CLARICE ROBERTS on behalf of
RANDALL L. CLARK, deceased,**

     **Plaintiff,**

**vs.**                     **Case No.  4:08cv163-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Randall L. Clark, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff is now deceased, but the date of his death is unknown.  The claim is presented on his behalf by his mother, Clarice Roberts.

Plaintiff was 42 years old at the time of the administrative hearing, had a 12th grade education with some community college, and had past relevant work as a dairy farm manager.  Plaintiff alleges disability due to seizures, cerebrovascular disorder, stroke, diabetes, depression, anxiety disorder, and memory loss.

The Administrative Law Judge found that Plaintiff had the following severe impairments: seizure disorder, history of stroke syndrome, vertigo, diabetes mellitus, and hypertension, but that none of these met or equaled a listed impairment.  R. 19-20. He found that Plaintiff did not have a severe mental health impairment.  R. 19.  The ALJ found that Plaintiff had the residual functional capacity to perform light work, except that he must avoid climbing ladders, heights, dangerous machinery, and that he suffers from balance problems due to decreased vision.  R. 20.  Relying on testimony from a vocational expert, the ALJ determined that Plaintiff could perform work as an animal caretaker, poultry breeder, surveillance systems monitor, and order clerk, and, consequently, was not disabled as defined by Social Security law.  R. 24.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[1]

The administrative hearing was held on May 22, 2007.  R. 346.  Plaintiff was 42 years of age on the date of the hearing.  R. 355.  He acknowledged that he had had a drug problem, but he said that he had abstained from using drugs since April, 2004.  R. 350.  Plaintiff had been in jail from April, 2004, for a period of months, and then was on probation.  R. 351-353.  His weekly urine tests while on probation had been negative for drug use.  R. 351.  He said that while at an inpatient facility (Phoenix House) as a requirement of probation, he had three strokes.  R. 350-351.

Plaintiff said he worked for Walmart for about six months in 2004.  R. 353.  He stopped work on October 6, 2004, when he was arrested again.  R. 352-353.  Plaintiff had previously worked for his father as a manager of a dairy farm for 18 years.  R. 354.  Plaintiff managed the day-to-day operations and supervised other farm employees.  *Id.*

Plaintiff testified that he had suffered three strokes.  R. 355.  After the strokes, Plaintiff said he had some paralysis in his left hand, left arm, and left leg.  *Id.*  He said that his hand felt "leathery," and that he could not grasp things with that hand as he used to.  R. 356.  His right hand was unaffected.  *Id.*

Plaintiff said that as a result of the strokes, his left leg felt like it tightened up when he walked.  R. 356.  He thought that he could walk 200 hundred yards.  R. 356-

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at: http://www.mercksource.com (Medical Dictionary link).

357.  He said that when he stood up or made any sort of sudden movement, he felt unbalanced.  R. 357.

Plaintiff said that since he had had his strokes, he no longer had vision in the upper left quadrant of his left eye.  R. 358.  He said he had been advised not to drive by his treating eye physician.  *Id.*

Plaintiff said that he had had four seizures.  R. 358.  He was taking medication to prevent seizures.  *Id.*  He said that his seizure medication made him drowsy.  R. 359.  He said that after lunch every day he takes a nap for a couple of hours.  *Id.*  He said that on "bad days," he did not want to move.  R. 360.

Plaintiff said he had panic attacks when he was in a place he had not been before.  R. 362.  His last panic attack had been in the restroom of a drug store.  R. 363.  He had gotten confused when he entered the store because the aisles had been rearranged, and confusion, he said, leads to a panic attack.  R. 363-364.  He said he tried to "stay in my own little environment, my own little world."  R. 364.  Plaintiff said he took Ativan[2] or Xanax[3] for anxiety and panic attacks, but the medications made him groggy.  R. 362.

Plaintiff testified that his temper was "real short and I can't stand any pressure. People agitating at me or bothering me, asking me a bunch of questions, you know.  I'm just real short."  R. 365.  He said: "I get really aggravated by it [people asking me

---

[2] Ativan is used in the treatment of anxiety disorders and for short-term (up to 4 months) relief of the symptoms of anxiety. It belongs to a class of drugs known as benzodiazepines.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[3] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

questions]."  R. 366.  He said that when he had had his last grand mal seizure, he was

very belligerent with the deputy sheriff who arrived.  R. 366-367.  Plaintiff said that in his

former work, he had "to be able to be a policeman, a teacher, a problem solver, and

everything for people for [sic] work for me.  But I mean, I can't do that now."  R. 367.

Plaintiff said his son or daughter drove him on errands.  R. 368.  He went to the

grocery store to shop twice a month.  R. 369.  His daughter did household chores.  *Id*.

Plaintiff thought that he could lift 20 to 30 pounds with his right hand, and could carry a

gallon of milk with his left hand.  R. 372.  He said he lost his balance coming down

stairs.  *Id*.

The vocational expert said that Plaintiff's prior work as a dairy farmer had an SVP

(specific vocational preparation) of 7 requiring medium exertion.  R. 374.  An SVP of 7

indicates that this was a skilled work job.[4]

The ALJ asked the vocational expert to assume a person of Plaintiff's age, work

experience, without any severe mental impairments, who can occasionally lift 20

pounds, and frequently lift 10 pounds, and can sit, or stand, or walk six hours in an eight

hour workday.  R. 378.  The expert was also asked to assume that the person can

occasionally climb ramps and stairs, but never climb ladders or be exposed to

machinery and heights, and had a limited field of vision on the left side.  R. 378-379.

The expert said that such a person could no longer do work as a dairy farmer or an

inventory stock clerk.  R. 379.  The expert said that, "sort of in line with his history," such

---

[4] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available at 2000 WL 1898704.

a person could do work as a non-farm animal caretaker, a job with an SVP of 2 or 3.  R.

379.   The expert said that such a person could also work as a poultry breeder, SVP of

7.  R. 380.   Considering sedentary jobs, the expert said that such a person could also

do work as a surveillance system monitor, SVP of 2 or 3.  R. 380.  Such a person could

do work as an order clerk, SVP 3.  R. 381.

If, however, Plaintiff's testimony were to be found to be totally credible, said the

expert, he could do no work at all.  *Id*.  The expert said that Plaintiff would be unable to

do any work, in that event, because:

> At least one day a week, he would not be able to work at all.  That he's
> belligerent around people.  That he is drowsy and lacking in alertness
> because of his medications.  Moody.  That he doesn't have the energy to
> sustain activity, that because of that he lays around all day.  That's what
> he said.

R. 382.

**Medical Evidence**

Plaintiff was admitted for inpatient drug abuse treatment at Phoenix House on

February 17, 2005.  R. 169.  He was then being treated for hypertension,

hyperlipidemia, and Type II diabetes, under control with medication. R. 170.  On May

31, 2005, he suffered a right thalamic and cerebellar stroke.  R. 169.  After a short stay

in the hospital, he was returned to his home to recover.  *Id*.  He had a followup visit with

Dr. Howell, a neurologist, on July 12, 2005, and it was noted that he was still

hypertensive and continued to have some residual effects from the stroke.  *Id*.  Due to

the "continued instability with his medical conditions," he was discharged from Phoenix

House.  *Id*.

Dr. Howell examined Plaintiff on a consulting basis on June 1, 2005, and prepared a report.  R. 147.  Dr. Howell noted that Plaintiff seemed to have suffered two stroke-like events prior to his hospitalization on May 31, 2005, and these events impaired the peripheral vision in his left eye.  *Id.*  Upon examination, Dr. Howell found that Plaintiff had a left visual field deficit, worse in the left upper quadrant than the left lower quadrant.  R. 148.  He also found that Plaintiff was "clumsy on the left arm and leg."  *Id.*  Dr. Howell felt that Plaintiff had had a stroke, and noted that his family had a history of premature vascular disease, particularly cardiac.  *Id.*  He also noted that Plaintiff himself had a history of drug use, hypertension, and diabetes.  *Id.*

On July 12, 2005, Dr. Howell said that except for the impairment to his vision in the left upper quadrant, Plaintiff had "very little focal neurologic deficits on today's exam."  R. 164.  Plaintiff could detect movement and count fingers in the left lower quadrant of his vision.  *Id.*

On December 9, 2005, Plaintiff had a seizure with full body convulsions lasting about three minutes.  R. 190.  A CT scan revealed chronic right posterior cerebral territory infarction with a few chronic appearing small vessel infarcts involving the right thalamus and right inferior cerebellum, but with no acute intracranial abnormality.  R. 189.  Plaintiff was discharged with a diagnosis of syncope.[5]  R. 193.

Plaintiff was examined on a consultative basis on February 25, 2006, by Frank Medicino, M.D.  R. 200.  Plaintiff said that since the strokes, he had had problems with balance, memory, and panic attacks.  *Id.*  Dr. Medicino noted:  "He describes the panic attacks as having tremendous fear, if he finds himself in a new and unfamiliar place."

---

[5] Syncope is fainting.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

*Id*.  It was observed that the December, 2005, CT scan "showed some scar tissue from the old strokes."  *Id*.  It was also noted that Plaintiff was not taking seizure medication, and had not had another seizure.  *Id*.  Plaintiff said that he had had diabetes since the early 1990s, and that his diabetes was well controlled with medication.  *Id*.  He reported that he last worked at WalMart.  *Id*.  Plaintiff said that he was able to drive himself short distances despite the seizure and his "one eye deficit."  R. 201.  Dr. Medicino reported that Plaintiff was six feet tall, 255 pounds, and obese.  *Id*.  He did a "gross" eye exam, and found that Plaintiff could see the number of fingers on his hand at a distance of eight feet with both eyes.  *Id*.  Plaintiff was unable to do a full squat, and was unable to do heel to knee standing on his left leg.  *Id*.  He could do a very short heel-toe walk.  *Id*. All of the joint maneuvers (cervical, thoracolumbar, hip, knee, and ankle) were found to be normal, and straight leg raising was negative.  R. 202.  Plaintiff's strength was decreased on the left side, 2/5 on the left hand, and 3/5 in the left leg.  *Id*.  Dr. Menicino concluded:

> I was unable to determine precisely where the main problem lies regarding his inability to work full time.  I believe, especially viewing the crying reaction that he had during the interview, there are some underlying psychiatric problems that have not been evaluated.  I would strongly suggest to the Disability Board that he have a psychiatric psychological evaluation.
>
> Regarding the physical evaluation, the number of hours the claimant could be expected to stand and walk in an eight-hour workday is without restrictions.
>
> Sitting is without restrictions.
>
> No assistive device was used or applicable.
>
> Lifting and/or carrying occasionally 20 pounds and frequently 10 pounds.

There are some minimal occasional limitations of posture because of the weakness in the left lower extremity but mainly able to bend, stoop and kneel without too much difficulty.

There were no manipulative or environmental limitations.

R. 202-203 (emphasis added).

On March 22, 2006, Plaintiff was evaluated on a consultative basis by Heather Bradley, Ph.D.  R. 211.  Plaintiff was cooperative, was in good spirits, did not appear anxious or depressed, and there was no evidence of panic.  *Id.*  Dr. Bradley found that Plaintiff seemed to be able to concentrate adequately, was not easily distracted by external stimuli, and answered questions without difficulty.  *Id.*  She said that Plaintiff reported that he could drive "without difficulty but was unable to perform household or other ADL's [activities of daily living] other than personal hygiene."  R. 212.  She said that Plaintiff "appeared to be a questionable informant regarding current ability to function."  *Id.*  He said that his main complaints were stroke and seizure.  *Id.*  He was not taking any psychotropic medications.  *Id.*  Plaintiff reported to Dr. Bradley that after the strokes, he felt disorganized and more emotional.  *Id.*  Plaintiff said he did not feel normal, "not like I used to be," after the December seizure.  *Id.*  He reported difficulty with concentration, low tolerance of frustration, and social difficulties.  R. 213.  Plaintiff also complained of "panic attacks," like a seizure, when he felt "strange feelings" and lost.  *Id.*  These attacks, he said, occurred in an unfamiliar place, but were not accompanied by shortness of breath, heart palpitations, or an urge to flee.  *Id.*  Plaintiff had no history of treatment for psychological concerns.  *Id.*  Plaintiff said he could no longer work because he was told by an emergency room doctor that he had "major

issues going on in my brain."  *Id.*  He said that  the week preceding this examination he had been told to stop driving due to vision problems.  R. 214.

Dr. Bradley found Plaintiff's mental status to be essentially normal.  R. 214. Plaintiff had adequate short-term memory, attention, concentration, and expressive language.  *Id.*  He followed a three step command without difficulty.  *Id.*  He had at least average intelligence, displayed intact reasoning, and his social judgment was good.  *Id.* Dr. Bradley felt that it was unclear "to what degree, if any, Mr. Clark's 'strokes' have caused permanent damage to his cognitive functioning."  R. 214.  She said:  "During interview and mental status examination, there are no indications of significant deficits." *Id.*

> The continuing symptoms he describes are also not consistent with panic attacks.  He does not appear to have significant issues of mood disruption or anxiety at this time.  He was able to interact easily and congenially with the examiner.  No social anxiety was noted.  There was nothing in the interview or his presentation to suggest the present [sic, presence] of a psychological disability that would prevent Mr. Clark from attaining or maintaining employment.

*Id.*  It was thought that Plaintiff would benefit from therapy "to manage his addictions issues."  *Id.*  It was also thought that a neurologist should review Plaintiff's medical record, "particularly his radiology records," "to determine the magnitude of his strokes and possible seizure activity and to what degree that would be expected to impact his daily functioning."  R. 214-215.

On April 24, 2006, Plaintiff reported to the emergency room feeling "kind of different."  R. 221.  He was disoriented, had stiffness in his left leg and left arm, and feared he was having another stroke.  *Id.*  No neurological deficits were noticed.  *Id.*  A CT scan found the same brain scarring that had been detected in the earlier scan, with

no acute changes seen.  R. 220.  An MRI the next day showed the same scarring, but again with "no acute intracranial abnormality."  R. 232.

On April 26, 2006, state agency psychologist Joseph Peterson, Ph.D., J.D., determined that Plaintiff's mental impairments were not severe, a determination made from looking only at the medical and mental health records.  R. 233.  He determined that Plaintiff's mental condition most closely resembled affective disorders and seizure disorder.  R. 241.  He determined that Plaintiff was not limited at all in activities of daily living or episodes of decompensation of extended duration, and was only mildly limited in social functioning and concentration, persistence, or pace.  R. 243.  Dr. Peterson noted that Plaintiff had pursued no mental health treatment except for court-ordered substance abuse treatment.  R. 245.  Dr. Peterson also noted that Dr. Bradley's findings of March 22, 2006, "are contraindicative of any diagnosable mental d/o beyond mild/moderate Adjustment Reaction."  *Id*.  He said that Plaintiff "[c]urrently continues to reside independently w/his mother & to function adequately in a full range of routine [activities of daily living] w/in his physical & motivational/volitional parameters."  *Id*.

On December 14, 2006, Plaintiff was examined on a consultative basis by Akash Ghai, M.D., on referral by Dr. Koberda.  R. 327.  Plaintiff complained of tingling, weakness, anxiety, depression, and loss of memory.  *Id*.  Dr. Ghai scheduled a transesophageal echocardiogram since the source of Plaintiff's strokes might have been his heart.  R. 328.  He noted that Plaintiff was hypertensive that day.  R. 329.

On January 10, 2007, Plaintiff saw J. Lucas Koberda, M.D., a followup visit for his strokes.  R. 289.  He was awaiting the transesophageal echocardiogram.  *Id*.  He was accompanied by his mother, and his mother reported "significant behavior

changes," "losing his temper and becoming aggressive on occasions."  *Id.*  Dr. Koberda

noted:  "Prior MRI was reviewed which showed right PCA stroke with right temporal and

occipital lobe strokes, of course, which can give behavioral problems especially in the

right temporal lobe."  *Id.*  Dr. Koberda discussed with Plaintiff and his mother a change

of medication for this, but they were not interested as he "tolerates Keppra[6] well and

has had no seizures and he would like to stay on this medication, at least at this point."

*Id.*  On examination, Dr. Koberda found that Plaintiff was alert, oriented, had normal

speech and comprehension, and had normal gait, with no balance problems.  *Id.*  Dr.

Koberda said:

> I did discuss with him light duty work and due to behavioral problems and
> aggressive behavior, most likely that would not be the best for him and
> others.  I think at [t]his point, he is unable to go back to any type of work.

*Id.*  Dr. Koberda wrote on February 5, 2007, that "Patient is unable to work at this time

due to all medical problems."  R. 288.

On January 26, 2007, Plaintiff was seen by Joy Ablordeppey, M.D.  R. 309.  He

said he was too drowsy using Xanax.  *Id.*  He said he was still feeling anxiety.  R. 310.

Ativan was prescribed.  R. 309.  Xanax was discontinued.  *Id.*  It was also noted that

Plaintiff's hypertension was uncontrolled.  R. 311.  She found that Plaintiff's mood was

guarded, but that he was in no distress, and his thought processes, insight, and

judgment were unimpaired.  *Id.*

---

6 Keppra helps reduce the frequency of partial epileptic seizures, a form of epilepsy
in which neural disturbances are limited to a specific region of the brain and the victim
remains conscious throughout the attack.  PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

On February 15, 2007, Plaintiff was seen by Dr. Koberda.  R. 337.  The results from the transesophageal echocardiogram were normal.  *Id.*  Plaintiff exhibited normal speech and comprehension, and Dr. Koberda's impression was that Plaintiff was doing well.  *Id.*  He said that Plaintiff "continues being disabled from work at this point."  *Id.*

Plaintiff had another seizure on March 26, 2007, when he fell out of a chair.  R. 319.  Dr. Koberda noted on April 23, 2007, that Plaintiff's doses of Keppra had been increased.  R. 336.  Plaintiff had normal gait and no balance problems.  *Id.*  Dr. Koberda increased the dose of Keppra again.  *Id.*  He told Plaintiff not to drive a motor vehicle. *Id.*

On July 13, 2007, Dr. Koberda again saw Plaintiff.  R. 335.  Plaintiff had had no seizures since he increased the dose of Keppra.  *Id.*  He reported intermittent numbness of his left hand.  *Id.*  Plaintiff had good strength in his extremities, normal gait without balance problems, and normal speech and comprehension.  *Id.*  Dr. Koberda said he presented "with better performance."  *Id.*

On September 13, 2007, Plaintiff returned for his neurological problems.  R. 334. He still had intermittent numbness of his left hand.  *Id.*  Nerve conduction studies revealed evidence of left carpal tunnel syndrome.  *Id.*  It was noted that Plaintiff was diabetic, "which predisposes him to neuropathy."  *Id.*  Dr. Koberda said that:

> from a neurological point of view since the patient has had a stroke and seizures and now has been diagnosed with neuropathy, he definitely is a good candidate for disability.  However in the future if he has no frequent seizures, he may be able to be involved in light duty employment like office type of job.

*Id.*

**Legal Analysis**

**Whether the ALJ erroneously rejected the opinion of the treating neurologist**

Plaintiff contends that the ALJ erred in failing to give considerable weight to Dr. Koberda's opinion that Plaintiff's behavioral problems were the result of his strokes. Doc. 19, pp. 13-14.  The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to

refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The ALJ determined that "little weight can be given to Dr. Koberda's statements that disability should be granted."  R. 22.  The ALJ pointed out that Dr. Koberda's treatment notes report "good control of the claimant's seizures, with medication with only a mildly abnormal EEG."  *Id.*  The ALJ noted Plaintiff's history of strokes, but observed that Dr. Koberda's examinations showed the Plaintiff had a normal gait and balance after suffering these strokes.  *Id.*  These findings are supported by substantial evidence in the record discussed above, and are adequate reasons to discount Dr. Koberda's conclusory statement that Plaintiff is disabled.

The ALJ also reasoned that there was "no support for Dr. Koberda's opinion of the claimant's occasional behavioral problems and aggressive behavior [that] preclude all work."  R. 22.  This conclusion is supported by substantial evidence in the record. First it is observed that Dr. Koberda did not say that the brain damage caused by

Plaintiff's strokes did in fact cause behavioral problems.  He only said that behavioral

problems could be caused by such damage.  Further, as Defendant points out, the

evidence of behavioral problems came only from Plaintiff and his mother, without

specificity as to severity or frequency, not from Dr. Koberda's observations.  It may be

that Plaintiff had behavioral problems, but Plaintiff had no history of treatment for

behavioral problems and no medical provider made objective findings that Plaintiff had

behavioral problems either.  Those who did examine or treat Plaintiff did not objectively

find evidence of behavioral problems.  Dr. Bradley, the first examining psychologist,

found Plaintiff to be cooperative, in good spirits, not anxious or depressed, and without

evidence of panic.  R. 211.  Dr. Bradley felt that it was unclear "to what degree, if any,

Mr. Clark's 'strokes' have caused permanent damage to his cognitive functioning."  R.

214.  She said:  "During interview and mental status examination, there are no

indications of significant deficits."  *Id*.  She also said:

> The continuing symptoms he describes are also not consistent with panic
> attacks.  He does not appear to have significant issues of mood disruption
> or anxiety at this time.  He was able to interact easily and congenially with
> the examiner.  No social anxiety was noted.  *There was nothing in the
> interview or his presentation to suggest the present [sic, presence] of a
> psychological disability that would prevent Mr. Clark from attaining or
> maintaining employment.*

*Id*. (emphasis added).  On January 10, 2007, Dr. Koberda found that Plaintiff was alert,

oriented, and had normal speech and comprehension.  R. 287.  On January 26, 2007,

Dr. Ablordeppey found that although Plaintiff's mood was guarded, he was in no

distress, and his thought processes, insight, and judgment were unimpaired.  R. 309.

On February 15, 2007, Dr. Koberda found that Plaintiff exhibited normal speech and

comprehension, and was doing well.  R. 337.  Finally, even though he said several

times that Plaintiff was disabled, on September 13, 2007, Dr. Koberda said that

although Plaintiff was a "good candidate for disability" due to his stroke and seizures,

"[h]owever in the future if he has no frequent seizures, he may be able to be involved in

light duty employment like office type of job."  R. 334.  Dr. Korbeda made no mention of

behavioral problems, and his notes reflect nothing more on that subject than what was

subjectively told to him by Plaintiff and his mother.  Consequently, the ALJ did not

commit error in failing to give substantial weight to the unsupported opinions of Dr.

Koberda.[7]

**Whether the ALJ erred in finding Plaintiff to be not entirely credible**

Plaintiff contends that the ALJ's finding that his testimony was not entirely

credible was not supported by substantial evidence in the record.  Doc. 19, p. 17.  This

claim is governed by legal principles guiding the ALJ's evaluation of a claimant's

subjective testimony as to impairments caused by pain and other symptoms.

Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be

---

[7] These reasons are sufficient to sustain the ALJ's findings, and renders irrelevant
the findings based upon Dr. Rubini's observations.  Plaintiff's argument, however, that
he was unable to cross examine Dr. Rubini, doc. 19, p. 14, is not persuasive.
Consultative examinations are common in social security cases, and cross examination
is almost never available since the physicians are not called as witnesses.

> expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so. *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ discredited Plaintiff's testimony, reasoning that "the claimant's seizures,

as well as hypertension and diabetes, are considered controlled with medication." R.

22. This finding is supported by substantial evidence in the record. While there was

one notation that Plaintiff's hypertension was not controlled on a particular day, there is

no sustained evidence of a lack of control. Plaintiff's seizure medication was increased

to a level that seems to have controlled his seizure disorder, and there is no medical

evidence to suggest disability arising from hypertension or diabetes. The ALJ also

noted that Plaintiff had not experienced another stroke since the strokes in 2005. *Id.*

This is likewise supported by substantial evidence in the record discussed above. The

ALJ said he was not finding that Plaintiff did not have any limitations due to his

impairments, but he included this in his residual functional capacity. *Id.*

It is true that the ALJ's reference to the apparent control of Plaintiff's seizures,

strokes, hypertension, and diabetes, did not address the issue of whether Plaintiff

suffered permanent brain injury from the set of strokes causing behavioral problems, and Plaintiff accurately makes that point.  Doc. 19, p. 17.  But the problem with this argument is that the ALJ's conclusion that Plaintiff in fact did not suffer significant and limiting behavioral problems renders this argument irrelevant.  Dr. Koberda said that the scarring on Plaintiff's brain from the strokes could cause behavioral problems, but this observation, without credible evidence that Plaintiff in fact could not work due to frequent behavioral problems, is beside the point.  The ALJ's credibility determination is supported by substantial evidence in the record.

### Whether the ALJ erred in finding that Plaintiff could perform the jobs named by the vocational expert

Plaintiff argues that three of the four jobs identified by the vocational expert as jobs that Plaintiff could still do, despite his limitations, were either semi-skilled or skilled jobs.  Doc. 19, p. 18.  Plaintiff notes that the jobs of animal caretaker and order taker are semi-skilled, and the job of poultry breeder is a skilled job.  *Id*.  Plaintiff argues that the job of surveillance monitor may be semi-skilled, and the vocational expert did not identify how many of such jobs may be unskilled.  *Id.*, p. 19.  Plaintiff argues that there was no evidence that he had the skills needed that could be transferred to any of those jobs.  *Id.*, p. 18.  Plaintiff argues that a necessary step was to establish that he had transferable skills.  *Id.*  Plaintiff also argues that he could not do the job of surveillance monitor due to his limited field of vision.  *Id.*, p. 19.

This argument is unsupported.  The vocational expert first considered Plaintiff's past relevant work as a dairy farm manager, finding that it was a skilled job with an SVP of 7.  R. 374.  The vocational expert then chose the animal caretaker job as a job "sort of in line with his history," with an SVP of two or three.  R. 379.  It is reasonable to

conclude that a person who has managed a dairy farm has transferable skills to take care of non-farm animals.  Similarly, the expert said that a person who had worked as a dairy farm manager could work as a poultry breeder, SVP of 7.  R. 380.  Even if the identification of the surveillance system job was error due to Plaintiff's visual field problems, these jobs were enough to find Plaintiff to be not disabled.  But reliance upon the surveillance system monitoring job was not error as there is no field of vision or depth perception requirement for that job.  DICTIONARY OF OCCUPATIONAL TITLES (4th Ed., Rev. 1991), DICOT 379.367-010, 1991 WL 673244.  This issue is not persuasive.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 12, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:08cv163-MP/WCS